PEOPLES BANK & TRUST CO. v. THE FIDELITY AND CASUALTY COMPANY OF NEW YORK.

(Filed 8 March, 1950.)

**1. Forgery § 1—**

A person without a bank account who signs his name to checks and presents them to the bank with intent that the signature should be taken as that of another of the same or similar name who has funds on deposit, and cashes the checks fraudulently and with knowledge that he was withdrawing from the bank the funds of such other person, is guilty of forgery.

**2. Same—**

The common law definition of forgery obtains in this State, the statute, G.S. 14-119, not attempting to define it.

**3. Same—**

Forgery is the falsification of a paper, or the making of a false paper, of legal efficacy, with fraudulent intent.

**4. Same—**

An instrument may be a forgery even though in itself it is not false in any particular, if there is a fraudulent intent that the signature should pass or be received as the genuine act of another person whose signing, only, could make the paper valid and effectual.

**5. Same—**

An instrument is nonetheless a forgery because the signature is not identical with that of the person whose signature it is intended to simulate if they are sufficiently similar for the doctrine of *idem sonans* to apply, and the insertion of a middle initial not in the signature simulated is not a fatal variance.

**6. Indemnity § 2c—**

The indemnity bond in suit did not cover loss caused directly or indirectly by forgery. The evidence disclosed that the loss in suit resulted from the cashing of checks by a person without a bank account, who signed his name and presented the checks with intent that the signature should be taken as that of another person of the same name who had funds on deposit. *Held:* a peremptory instruction that the loss was due directly or indirectly to forgery, and the entering of judgment for insurer upon the jury's affirmative finding, is without error.

**7. Same—**

Where an indemnity bond covers listed losses and not loss in general, a loss not listed is not an exception from general coverage, and insurer does not have the burden of showing that the loss sued on was due to a non-insured cause.

**8. Trial § 28—**

An instruction that if the jury should find the facts to be as all the witnesses had testified and as the record evidence discloses, to answer the issue as directed, is the correct form of a peremptory instruction.

BARNHILL, J., took no part in the consideration or decision of this case.

PLAINTIFF's appeal from *Carr, J.,* November Term, 1949, EDGECOMBE Superior Court.

The plaintiff, appellant, sometimes herein referred to as the Bank, sued the defendant, sometimes referred to as the Insurance Company, on a policy issued by the latter, to recover for losses sustained by the bank through the transactions below described, in narrative form and in summary, from the evidence adduced by the plaintiff. The defendant contends that the losses are not covered by the terms of the policy.

The portion of the policy deemed pertinent to decision provides in section (a), *inter alia,* insurance against loss through various named

causes, including . . . "false pretense . . ." and in subsection (d) "against any loss (1) through accepting, cashing or paying forged or altered checks . . ." However a rider on the policy in the nature of an amendment provides: "In consideration of the premium charged for the attached bond it is understood and agreed as follows: 1. The attached bond is hereby amended: (a) By deleting insurance clause (D) . . . (c) By deleting from section 1 the following: Under subsection (a) : 'D and E.'" It is not disputed that the effect of the amended rider is to withdraw from the coverage "any loss effected directly or indirectly by means of forgery." Portions of the complaint and answer were introduced by the plaintiff eliminating matters not in dispute; and these admissions, together with the evidence, oral and documentary, present the following history:

At the time of the transactions noted there were living in the Town of Rocky Mount and in the country nearby two persons of the same or similar names: Otha G. Langley, referred to in the record as Nash Street Langley, and Otha Langley, referred to in the record as R. F. D. Langley. The latter had a sizable deposit and account with the plaintiff bank. The former had none, and had never had any. The Nash Street Langley, however, had a few times visited the bank and had small government checks cashed, but had never made any deposit.

About August 13, 1946, Claude Harris, Jr., came into the bank accompanied by a man unknown to the teller and said he knew the man was Otha Langley, with the statement: "He says he has an account here and this check is good." He handed the check to the teller who sent it up by a conveyor to the bookkeeping department and it was sent back "o.k." and was cashed. Harris and Langley then walked to the window facing the street and talked awhile. Then Langley came back to the teller's window and said, "See what my balance is." The teller wrote a slip, "Balance............ Otha G. Langley?", and sent it upstairs to the accounting department through a conveyor tube, and it was returned $2272.69." The teller was acquainted with Harris and at the time the check was presented Langley was standing right by him, close enough to hear the conversation. When Harris said, "This is Otha Langley, he says he has an account here," Langley made no statement but was silent.

Thereafter several paid checks were identified as having been presented and cashed by Otha G. Langley of Nash Street, withdrawing the funds from the balance above stated, to wit: A check for $600 on August 19, 1946; a check dated August 20, 1946, for $100; a check dated August 23, 1946, in the amount of $300; a check dated August 31, 1946, in the amount of $100; a check for $100 dated August 31, 1946; a check for $100 dated September 17, 1946; a check for $100 dated September 23,

1946; a check for $200 dated October 1, 1946; a check dated September 2, 1946, in the amount of $1,887.77, which was paid on October 3, 1946; a check dated November 12, 1946, for $644.95.

Several paid checks of Otha Langley of R. F. D. in amounts running from $30 to $189.25 were introduced in evidence.

Some of the checks cashed for Otha Langley of Nash Street were signed "Otha Langley" and some "Otha G. Langley." The bank account was in the name of "Otha Langley."

These checks were signed by Otha Langley of Nash Street in the presence of the teller to whom presented and all of them presented in person, and cashed. One teller testified that "almost every time there was a woman that came with him and she would write out the check and I would see him sign it and he would present it to me." As to the check for $1887.77, Langley, that is Langley of Nash Street, asked for his balance and it was given him as $1881.77. He went over and this woman made out the check and the witness saw Mr. Langley sign it. It was for $6.00 more than the amount shown on the ticket but the teller gave him the $1887.77.

The teller who paid the $600 check on August 19 testified the check was sent upstairs for verification to find out if Langley had enough money to cover the check and whether the signature was authorized. The check came back "o.k.," on both points. Witness stated that "I thought it was the Langley that had an account in the bank and cashed the check in the belief that he was the man who had the deposit." Langley then asked that "my" bank statement be sent to Nash Street. The question of his not having gotten the statements was raised but it does not appear that Langley answered that. He did want the address changed. As a result of his request the address was changed and the statements for August, September, October and November went to the new address at 822 Nash Street.

The account carried in the bank had no "G" in the name of the depositor.

The teller stated: "I would not have paid the money except for my belief that I was dealing with the man who had the deposit in the bank. I thought it was Otha G. Langley. I thought this man was the man who had the deposit and the same thing goes for all the checks I cashed. I do not recall that he gave me any reason for wanting the address changed. I would not have paid any money to this man without a check, a piece of paper representing the authority of the bank to pay it out. I paid this money on the faith of the check that I received from this man being a check drawn on our bank by a man who had money in the bank, to wit, Otha Langley. I was relying upon the statement made to me by the man

I was facing that he had funds on deposit and because of that statement and the fact that the bookkeeping department o.k.'d the check (when) I cashed the check. I did not even know Mr. Langley of R. F. D."

Another teller testified that she cashed the check now exhibited as dated November 12, 1946, in the amount of $644.95, "This man walked up to my window and asked me to find out his balance. I knew what his name was as I had cashed government checks for him before, so I inquired of the bookkeeping department and they sent his balance back, '$744.95.' He said, 'Make me a check out for that amount, except leave $100 in the bank.'" He was accompanied by a woman who made out the check and he signed it in her presence. "I think the 'G' in there was added after the check was cashed as it was not in there at the time I cashed it. Our checks are run through a photostat on the day they are cashed, or the next day, and the photostatic copy of the check now exhibited to me made from the photostat does not show the 'G' on it, and since the check just exhibited to me has a 'G' in it, it must have been added after it was cashed." This witness stated that she had cashed some government checks for the man as he was getting $20 a week government checks. These checks came to Otha G. Langley as a member of the "52-20 club," meaning a veteran, entitled to receive $20 a week for unemployment not in excess of 52 weeks. She stated that the check when cashed did not have any "G" in the signature but that this "G" was inserted by someone after the check had been returned to Langley. The ledger sheet now shows the account in the name of Otha Langley, 822 Nash Street, Rocky Mount, N. C. The witness stated that she would not have paid out the money "if he had not signed a piece of paper in the form of a check as my authority to pay out the bank's money. I paid it believing that he was the Otha Langley who had the deposit in our bank"; that she relied both upon the statement of Otha G. Langley and that of the bookkeeper. In every instance the check was signed in the presence of a teller and was personally presented at the window for payment.

Otha Langley of R. F. D., not having received his bank statements for the months of August, September, October and November, caused inquiry to be made at the bank and the fraudulent withdrawals from his account by Langley of Nash Street came to light. The sum of $1,797.58 was recovered from Otha Langley of Nash Street, reducing plaintiff's loss by that amount.

Otha Langley, R. F. D., testified that he made all the deposits credited to his account in the Peoples Bank; that he did not sign or authorize any of the checks aggregating $4,177.72 drawn by Otha G. Langley on his account; that the Peoples Bank had credited to the account of witness

(Otha Langley of R. F. D.) the amounts withdrawn on the fraudulent checks. He further testified:

> "When I opened my account I gave the bank my mailing address. I received bank statements up to the first of August, 1946, at Rocky Mount, R. F. D. #4. Then I went about three months without getting a statement. I never changed my address given to the bank. In October or November I made inquiry through my wife about my statements, and they began coming again to my regular address in December.
>
> "December 1, I got a statement that I didn't have any money in the bank."

Plaintiff rested, and at the conclusion of its evidence the defendant moved the court for judgment as of nonsuit, which was denied. The defendant offered no evidence. The plaintiff tendered the following issues:

> "Q. Did Otha Langley unlawfully obtain funds from the plaintiff bank by false pretense, as alleged in the complaint?" A. ..................
>
> "Q. If so, what amount is plaintiff entitled to recover of the defendant? A. .................."

Plaintiff moved for peremptory instructions in its favor on the issues. The motion was denied and plaintiff excepted.

The court declined to submit the issues tendered by the plaintiff and plaintiff excepted. The defendant tendered the following issue:

> "Q. Was the loss sustained by plaintiff bank set out in the complaint effected directly or indirectly by forgery as alleged in the answer?"

The court announced its intention to submit the issue tendered, and plaintiff excepted thereto.

The defendant then moved for peremptory instructions in its favor on the issue tendered by it. The motion was allowed and plaintiff excepted.

The court charged the jury as follows:

> "This case you have been hearing evidence in, Peoples Bank & Trust Company *v.* The Fidelity and Casualty Company of New York, involves a case in which a very interesting principle of law has been argued to the Court in your absence. The plaintiff bank sues the Fidelity and Casualty Company on a bond indemnifying it against certain losses and it all boils down to this question, under the language of the bond sued on, as to whether or not under all the

evidence that you have heard in this case the bank has as a matter of law sustained its loss by reason of a false pretense or by reason of a forgery, and that is a question of law, and after hearing the arguments on both sides (the Court is of the opinion that under the evidence of this case, the undisputed evidence, the plaintiff sustained a loss by reason of a forgery as a matter of law,) and under the bond the plaintiff would not be entitled to recover if the loss complained of was sustained either directly or indirectly by a forgery, and (the court being of that opinion the court instructs you as to the one and only issue submitted, 'Was the loss sustained by plaintiff bank set out in the complaint effected directly or indirectly by forgery as alleged in the Answer?' that if you find the facts to be as the witnesses have testified and as the record evidence discloses and as all the evidence tends to show, it would be your duty to answer that issue YES.)"

To the portions of the foregoing marked in parentheses the plaintiff excepted.

The plaintiff also excepted to the charge of the court as failing to state the evidence in the case and to declare and explain the law arising thereon.

The jury returned and asked an explanation as to what was meant by "direct" and "indirect" in the instruction given them. When the judge charged "If it was the direct or indirect use of a forged instrument, then the plaintiff would not be entitled to recover as under the bond it is specifically stated that if a loss of that type indirectly or directly is by forgery, then the bank is not covered under that bond. It covers losses by false pretense but not forgery." And upon an inquiry by the jury, "Impersonation is not related to forgery in any manner?", the court replied, "Yes, it might be. Forgery is the using of an instrument that is intended to be the instrument of another person. One who falsely uses a check or a note or a paper writing, even though it may contain his own name on it, if it is intended and designed to be received as the instrument of another person, then that is forgery." The plaintiff entered a general exception to the statements made by the court to the jury in response to its inquiry and to the failure of the court to adequately answer the jury's inquiry. The jury returned a verdict favorable to the defendant, answering the issue, Yes. And to the ensuing judgment in defendant's favor, plaintiff objected, excepted and appealed.

*Thorp & Thorp for plaintiff, appellant.*
*Battle, Winslow & Merrell for defendant, appellee.*

SEAWELL, J.　We are advised by counsel that the instant case is one of first impression in this State. Our own examination of the Reports reveals no decision of this Court dealing directly with a similar factual situation.

Two persons bearing the same name, Otha Langley, are concerned in the transactions out of which the litigation grew. Otha Langley of R. F. D. had a fund on deposit and a checking account with the plaintiff bank; Otha Langley of Nash Street had none. The latter, signing his own name, drew checks on the bank from time to time which were paid to him by the bank out of the deposit of the other Otha Langley, thereby drawing the funds of the latter from the bank during a period of over four months and in a total amount of over $4,000.00. The other Langley, the owner, was moderately checking on the deposit meantime.

We need not toy with the abstract question whether a person may commit forgery by signing his own name, since the attendant conditioning circumstances must be given to evoke an intelligent answer.

The determinative question on the evidence presented is whether Otha Langley of Nash Street, signing checks in his own name and fraudulently and knowingly withdrawing from the bank the funds of another of like or similar name, is guilty of forgery. The appellee says, Yes; the appellant says, No. We are inclined to agree with the appellee when it appears that the signature of the withdrawer, although in his own name, was intended to be taken as the act, or the genuine signature of the owner of the fund without whose authority it could not be lawfully withdrawn. See citations, *infra*.

It is not disputed that the policy does not cover losses which forgery is directly or indirectly effective in producing. Our task is, therefore, to analyze the transactions found in the evidence to see if they may be rectified so as to eliminate altogether the element of forgery as an influence, near or remote, in producing the loss. The appellant contends that this is easily done, since forgery was never at any time present. It sees as the only effective isolate of such refining process the crime of *false pretense*.

The crime of forgery has been made the subject of statutes in practically all the states in the Union, including our own. This makes it necessary to examine with care decisions cited as authority, many of which observe variations in the common law effected by the local statutes. The North Carolina statute pertinent to the class of forgery here charged, G.S. 14-119, (see also 14-120), has been held not to exclude common law forgery. *S. v. Hall,* 108 N.C. 776, 13 S.E. 189; *S. v. Lamb,* 198 N.C. 423, 152 S.E. 154; *Parrish v. Hewitt,* 220 N.C. 708, 18 S.E. 2d 141. At any rate it does not attempt to define forgery, but merely includes the acts

described as within that category. For a definition of forgery as within the statute we must resort to the common law.

Some pertinent definitions of forgery most frequently used by the courts are quoted here for the purpose of analyzing the crime into its essential constitutive parts, upon which emphasis must be placed, rather than upon the incidental or accidental features of its accomplishment,— one of which, in the instant case, is the identity or similarity of names between the alleged forger and the man whose rights are affected.

From the two leading law encyclopedias in common use we take the following:

> "Subject to statutory variations, forgery may generally be defined as the false making or materially altering, with intent to defraud, of any writing, which, if genuine, might apparently be of legal efficacy, or the foundation of a legal liability." . . . "The verb 'forge' in law means to make a false instrument in similitude of an instrument by which one person could be obligated to another for the purpose of fraud and deceit; to make or alter with intent to defraud." 37 C.J.S., "Forgery," Sec. 1.

> "Blackstone's definition of forgery (3 Com. 247) as 'the fraudulent making or alteration of a writing to the prejudice of another man's rights' is frequently quoted by the courts, as is Coke's statement (3 Inst. 169) that 'to forge is metaphorically taken from the smith who beateth upon his anvil and forgeth what fashion or shape he will. The offense is called *crimen falsi,* and the offender *falsarius,* and the Latin word, to forge, as *falsari,* or *fabricari,* and is properly taken where the act is done in the name of another person.'" 23 Am. Jur., "Forgery," Sec. 2. See 23 Am. Jur., "Forgery," Sec. 2, and 37 C.J.S., Forgery, Sec. 1; Words and Phrases, Perm. Ed., title, "Forgery."

> "Forgery, at common law, denotes a false making . . . a making, *malo animo,* of any written instrument for the purpose of fraud and deceit." 2 East P. C. 852.

> "It is the making or altering of a document with intent to defraud or prejudice another so as to make it appear to be a document made by another." *In re Windsor,* 10 Cox C. C. 118, 124.

From these definitions we find that the essentials to the completion of the offense are: (a) The falsification of a paper, or the making of a false paper, of legal efficacy "apparently capable of effecting a fraud;" (b) the fraudulent intent. 37 C.J.S., "Forgery," Sec. 3. It is to be noted that the falsity of the writing does not necessarily or usually refer to the tenor of the writing or of facts stated in it, but to the want of

genuineness in its making,—"without regard to the truth or falsehood of the statement it contains;" *Id.,* Sec. 5.

In forgeries of the character under consideration the falsity of the paper consists in the falseness of its purported authority, the fraudulent intent that the signature shall pass or be received as the genuine *act* of the person whose signing, only, could make the paper valid and effectual. The question of intent is dominantly important.

False pretense and forgery are closely akin, both belonging historically to the family of offenses known to the common law as "cheats," and now so classed. False pretense is the heart of forgery,—the essence of its being. The principal difference between the two, historically developed in the common law, is that forgery exclusively pertains to a writing, while false pretense covers fraudulent deceits by parol. Treatment of forgery as a separate offense came from recognition that a fraud perpetrated in altering a writing or in making a false writing tends directly to destroy the security which permanent monuments in writing give to transactions affecting the more important rights of persons privy to them. It became a separate and graver offense; but the *gist* of forgery still is *fraud*. *Davenport v. Commonwealth,* 154 S.W. 2d 552, 287 Ky. 505; *Leslie v. Kennedy,* 225 N.W. 469, 249 Mich. 553; *S. v. Luff,* 198 N.C. 600, 152 S.E. 791; Burdick, Law of Crime, Vol. 2, p. 550, sec. 663.

There is then no logical reason whatever that we can see that would confer immunity from the charge of forgery upon a person who signs his own name to a check with the fraudulent intent that it should be taken as the act of another person of like name, thereby withdrawing to his own use the deposits made by another. While, as stated, that exact situation has not been presented to this Court on any appeal so far as we can find, there is such a consensus of authority on the subject in other states and among learned writers that we must consider the proposition definitely established by the weight of authority as well as logical and sound in principle. 37 C.J.S., "Forgery," Sec. 9; 23 Am. Jur., Sec. 9; *Thomas v. First National Bank,* (Miss.) 58 So. 478, 39 L.R.A., N.S. 355; *Commonwealth v. Foster,* 114 Mass. 311, 19 Am. Rep. 553; *Barfield v. State,* 29 Ga. 127, 74 Am. Dec. 49; *International Union Bank v. National Surety Co.,* 245 N.Y. 368, 52 A.L.R. 1375; *White v. Van Horn,* 159 U.S. 3, 40 L. Ed. 5; 2 Bishop's Criminal Law, Sec. 585; *Edwards v. State,* 53 Tex. Cr. 50, 108 S.W. 673; 126 Am. St. Rep. 767; *People v. Rushing,* 130 Cal. 449, 62 P. 742, 80 U.S.R. 141; *Beattie v. National Bank of Ill.,* 171 Ill. 581, 65 U.S.R. 318. Economy of space compels us to make the list selective rather than exhaustive. We think we should add to the foregoing authorities, however, *Bank v. Marshburn,* 229 N.C. 104, 47 S.E. 2d 793, which the appellee says, and we think with reason, commits the Court to this view.

It is suggested by the appellant that there is not sufficient similarity between the names of Otha Langley and Otha G. Langley to bring the case within the definitions of forgery, although it may have been false pretense. The authorities seem to be against that position. The evidence shows that the checks were drawn by Langley of Nash Street by signatures sometimes made Otha Langley, and sometimes written Otha G. Langley; but the similarity of the names, certainly when the fraud has been accomplished, has in similar cases been considered sufficient. 37 C.J.S., "Forgery," Sec. 13. A similar position with regard to handwriting was taken in the case of *S. v. Cross and White,* 101 N.C. 770, 7 S.E. 715, and rejected by the Court:

> "This proposition would excuse an act of forgery in every case even when the fraud had been consummated, when the person upon whom it was practiced was unacquainted with the handwriting of one whose signature it purported to be and who reposed confidence in the genuineness of the paper. The variation in the writing may be evidence of the absence of an intent to defraud, but not when the intent has been developed in the act of defrauding . . . Besides the variance was not so marked as to call for such a direction."

*State v. Chance,* 82 Kan. 388, 20 Ann. Cas. 164; *S. v. Lane,* 80 N.C. 407; *S. v. Collins,* 115 N.C. 716, 20 S.E. 452; *S. v Higgins,* 60 Minn. 1, 51 A.S.R. 490.

The general holding is that when designed and used as an instrument of fraud the act is forgery, although the names are not identical, but merely *idem sonans;* and the use of a recurrent middle letter not in the simulated signature is not a fatal variance. *White v. Van Horn, supra.* The contention must be rejected.

We have already referred to the fact that the combination of circumstances making this kind of forgery opportune must be rare. And we might add here as peculiarly applicable to the instant case, the observation in *Commonwealth v. Foster, supra,* as follows:

> "The question of forgery does not depend upon the presence upon the note itself of the *indicia* of falsity. If extrinsic circumstances are such as to facilitate the accomplishment of the cheat without the aid of any device in the note itself, the preparation of a note, with intent to take advantage of those circumstances, and use it falsely, is making a false instrument."

As we have stated, the question of intent is dominantly important; and we think the controversy narrows down to the evidence tying Langley with the forgery. Outstanding items of this evidence are as follows:

It may be inferred that he discovered the existence of the account in the name of the other Otha Langley at the time the first check drawn by him was cashed, under the circumstances accompanying it, and found that his signature would pass the test at the teller's window. He promptly took advantage of this circumstance, and inquiring what "my" balance was,—knowing he had none—expressed no surprise at the amount given. Although he deposited nothing he knew the deposits grew from time to time in the name of Otha Langley. He himself had never deposited a cent there, and could not assume that he was the beneficiary of some anonymous friend, nor was he depending on an unlawful overdraft or an extension of credit by the bank. The assault was made upon a specific account, which the evidence discloses he hawked from the beginning of the transactions, inquiring with every withdrawal what "my" balance was. He requested that his bank statements be sent to a new address— his residence on Nash Street,—inferribly to put off the day of discovery, which he succeeded in doing for over four months, or until the real owner of the deposits became anxious to know why he had not received his statements, and discovered that his account had been milked almost as fast as he had replenished it, and that he had nothing. It may be inferred that the paid checks in evidence representing the modest and thrifty withdrawals of the rural Otha Langley, along with the spurious checks drawn by himself, went to Otha Langley at 822 Nash Street, giving him specific information of the identity of his namesake as the depositor.

We are only summarizing a few of the facts which the evidence tends to show and the legitimate inferences they engender, as an appellate judicial duty, apart from any intimation as to their ultimate truth. They constitute evidence of forgery.

We are not concerned here with the niceties which might be observed by the solicitor in choosing the subject of prosecution,—whether false pretense or forgery. We are convinced that if the culpable Langley had been tried and convicted of either offense the State would be estopped under the principle of former jeopardy of trying him again upon the other, since either crime must be predicated upon the same transactions. *S. v. Bell,* 205 N.C. 225, 171 S.E. 50. And we may observe, too, in that connection, that in a long series of transactions occurring during the four months Langley of Nash Street dealt with the account of Langley of R. F. D., forgery may have been aided by parol false pretense. Under a policy which expressly rejects liability for any loss effected directly

or indirectly by forgery it makes no difference which was the crime and which the adulterant.

The policy only covers the listed losses, not loss in general, and a clause which in plain terms rejects, in what must be considered the body of the instrument, loss which is effected directly or indirectly by forgery, is not an exception from a general coverage, leaving the burden on the defendant to bring itself within it.

It appears from the evidence that loss by forgery was deleted from the instrument, because such a coverage would have to be paid for by a higher premium, in language which does not constitute a *prima facie* covering.

We observe that each litigant requested a peremptory instruction to the jury in its own favor. The request of the plaintiff was denied and that of the defendant granted. The instruction was given in the formula frequently approved by this Court, leaving to the jury the weight of the evidence, or, in other words, its truth, as related to the issue, and the law to the court; and plaintiff's objection to that phase of the case cannot be sustained.

Other objections and exceptions not specifically mentioned herein have been carefully examined and do not, in our opinion, justify interfering with the verdict or judgment.

We find

No error.

BARNHILL, J., took no part in the consideration or decision of this case.